**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSSOCIATED WITH (207) 735-9606 THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE | No. 1:24-mj-00112-JCN<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Nicholas Rich, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.   I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (207) 735-9606, with an unknown subscriber (hereinafter "the 9606 number"), which has service provided by T-Mobile US, Inc. ("T-Mobile"), which has offices at 4 Sylvan Way, Parsippany, NJ. The 9606 number was activated in April 2024. It is believed to be used by Alexis De Leon. The 9606 number is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.   I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA") and have been since February of 2008.  I am presently assigned to the Bangor, Maine, office and have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c).  As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the

1

United States. During my employment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 841 and 846. I have conducted or participated in, among other things, surveillance, the execution of search and arrest warrants, debriefings of informants and confidential sources, and reviews of recorded conversations relating to narcotics trafficking. I have authored drug-related search warrant requests and successfully executed such warrants resulting in the seizure of drugs and other contraband, including firearms. I have also assisted in the execution of numerous drug-related search and arrest warrants. I have received extensive training in the field of narcotics enforcement and investigations. I am very familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs, including the use of the internet, internet platforms, applications, and cellular telephones to facilitate those activities.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal law, to include 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 21 U.S.C. § 843(b) (hereinafter "Target Crimes") have been committed by one or more persons. There is also probable cause to believe

that the location information described in Attachment B will constitute evidence of these criminal violations.

5. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. The DEA, together with partner agencies, has been investigating a subject known as "Leon Leon" and "Leon" for utilizing a particular Facebook Account (described for purposes of this affidavit as the "Leon Leon Account"), in the distribution of illegal controlled substances in the Bangor region. Specifically, the DEA has developed information that a Boston resident named Alexis De Leon, together with multiple associates, is using the Leon Leon Account and also cellular telephones to arrange for the distribution of drugs in eastern Maine. Leon and other individuals are making short trips from Boston to the Bangor region to distribute drugs and collect drug proceeds from Maine sub-distributors.

*Relevant Prior Authority*

7. On February 7, 2024, the DEA applied for and obtained a search warrant from this Court in 1:24-mj-34-JCN, which authorized the collection of prospective location information as to a T-Mobile cellular telephone assigned 917-963-3689 (the "3689 number"). That application and warrant are attached as Exhibit 1. The affidavit in Exhibit 1 explains the background of this investigation and the identification of both the Leon Leon Account and the 3689 number. Exhibit 1 is expressly incorporated

herein for purposes of probable cause. On March 7, 2024, the DEA applied for and obtained authority to extend the period of collection as to prospective location information as to the 3689 number. *See* Docket No. 1:24-mj-00070-JCN.

8. Based on additional information implicating Dianet Soto Sanz as being involved in the Leon DTO, on March 25, 2024, the DEA obtained from this Court a search warrant authorizing collection of prospective location information as to a specific phone number believed to be used by Soto Sanz, in 1:24-mj-00092-LEW (hereinafter the 9629 number). The facts presented in applying for said warrant included the following events:

    a. On February 27, 2024, the DEA requested that Maine State Police Trooper Thomas Pappas stop a particular vehicle, based on physical surveillance and location information received as to the 3689 number. Trooper Pappas stopped the subject vehicle and photographed the following identification cards for the female driver and her two male passengers: (1) Driver: Massachusetts Limited Term Driver's License for Dianet Soto Sanz of Dorchester, Massachusetts; (2) Passenger 1: Expired United States Visa for Ramon Antonio De Leon; (3) Passenger 2: Dominican Republic identification card for Alexis Mariano De Leon. Trooper Pappas did not detect or observe any obvious contraband inside the vehicle but did observe the two male passengers had between them a very large plastic container purporting to be a container for protein powder. He did not otherwise conduct a drug-related investigation and allowed the vehicle to depart a short time after stopping it. Alexis De Leon appeared to be the individual associated with the 3689 number identified by numerous witnesses

  as Leon Leon or Leon. Ramon De Leon had been identified as a suspected co-conspirator.

 b. On March 2, 2024, location information showed the 3689 again traveled to the Bangor region. On March 5, 2024, I interviewed Jane Doe 4[1] at the Penobscot County Jail in Bangor, Maine. Doe stated that on March 2, 2024, she coordinated the purchase of 300 grams of fentanyl from the Leon Leon Account. Doe stated she met with one Hispanic female and two Hispanic males at a specific restaurant in Bangor on that date and purchased approximately 300 grams of fentanyl for $3,000. Doe positively identified Ramon De Leon as one of the two males whom she purchased the 300 grams of fentanyl from on March 2, 2024.

*Jane Doe 5 Interview & Cooperation*

9. Based on information received pursuant to authority above, the DEA came to believe that Jane Doe 5 was a customer of Leon, due largely to a significant number of contacts between a phone associated with Jane Doe 5 and the 3689 number.[2] On March 29, 2024, I interviewed Jane Doe 5, who admitted to recently purchasing fentanyl from Leon and doing so via communications with the 3689 number. Jane Doe 5

---

[1] Jane DOE 4 is currently incarcerated at the Penobscot County Jail on a State of Maine arrest warrant for Failure to Appear. She has prior a criminal history that includes convictions for Assault. She is purportedly providing information to law enforcement in exchange for consideration towards a pending Maine State charge of Violation of Conditions of Release.

[2] Jane Doe 5 was already involved in an ongoing ATF investigation involving a January 2024 seizure of drugs and guns from her residence and a nearby camper. Jane Doe 5 had previously been interviewed by the ATF in regards to that investigation and did not at that time disclose any relationship to the Leon DTO. Jane Doe 5 has a significant criminal history, including prior felony convictions in Maine for drug trafficking, thefts, and burglary.

showed communications on her phone which, based on my training and experience, were consistent with her arranging purchases of controlled substances with Leon at the 3689 number.

10. Following this interview, Jane Doe 5 agreed to perform a controlled purchase of controlled substances from Leon, at the direction of MDEA and DEA. On April 2, 2024, Jane Doe 5 communicated with Leon and coordinated the purchase of approximately 30 grams of fentanyl in Bangor, Maine. On that date, the GPS ping of 3689 number remained in the Dorchester, MA area while the active GPS ping of the 9629 number traveled from Massachusetts to Bangor, Maine. Jane Doe 5 was outfitted with a covert audio and video recording device and provided serialized U.S. Currency. At approximately 12:45 P.M., Agents observed a Massachusetts plated vehicle, registered to Dianet Soto Sanz, arrive to Jane Doe 5's location. Agents subsequently identified the driver as Soto Sanz, and the passenger as Ramon De Leon. Jane Doe 5 met with Ramon De Leon in her vehicle and recorded the purchase of approximately 30 grams of suspected fentanyl for $600.00. The suspected fentanyl was retrieved by agents from Jane Doe 5 and she confirmed she had completed the agreed-upon transaction.

*Seizure of Phone from Mandi Ford*

11. After the above controlled purchase was completed with assistance from Jane Doe 5, surveillance was conducted on the vehicle operated by Soto Sanz as it continued to travel in Bangor.

12. In the afternoon of April 2, 2024, Agents observed Soto Sanz and Ramon De Leon arrive to 86 Kenduskeag Avenue in Bangor, Maine. I then observed Mandi

Ford meet with Ramon De Leon and Soto Sanz in the back seat of Soto Sanz' vehicle. Ford was then observed leaving the residence in her own white Fiat sedan.[3]

13. Agents then coordinated a traffic stop of the white Fiat, which displayed both an expired registration sticker as well as an expired Maine State inspection sticker. During the traffic stop, Bangor Police Officer Brian Cronk subsequently identified Ford as the driver of the vehicle and Steven Libby as the passenger of the white Fiat.

14. Agents joined Bangor Police Officers on this traffic stop and assisted in searching Ford's vehicle. Officer Cronk located and seized approximately 51.1 grams of suspected fentanyl in Libby's pocket. I provided Ford with her Miranda rights, as witnessed by MDEA Agent Dan Gastia, and asked Ford about the fentanyl. Ford identified a surveillance photo of Ramon De Leon and identified him as "Ramon", and admitted to meeting with Ramon and Soto Sanz on Kenduskeag Avenue prior to the traffic stop. Ford further admitted to collecting money from Jacob Herbert, Steven Libby, and Gabrielle Izsimone to purchase drugs from Ramon. Ford then showed Agents a text conversation on her phone ("the Device") between herself and the 3689 number. Within the conversation, phone number 3689 identified themselves as "Leon." The text conversation began on March 22, 2024, and continued through April 2, 2024. In my

---

[3] Mandi Ford had previously confessed to being supplied with controlled substances by the Leon DTO. On February 7, 2024, I had spoken with Mandi Ford while she was incarcerated at the Penobscot County Jail. At that time, in a Mirandized interview, Ford stated she and her boyfriend had been purchasing fentanyl from the Leon DTO. She specifically described Ramon De Leon staying with her and her boyfriend for the purpose of distributing drugs. She provided a photograph on her phone of an immigration document with a photograph of Ramon De Leon. She described obtaining drugs from the Leon DTO for a time period spanning multiple years.

experience and training, and based on an interpretation of the messages, these messages discussed the distribution of drugs to Ford on April 2, 2024.

15.    Agents concluded the traffic stop by seizing the 51.1 grams of suspected fentanyl and the Device. Ford and Libby were released pending further investigation and possible future charges.

*Identification of the 9606 Number*

16.    Before the events of April 2, 2024, I had come to believe that the individual utilizing the 3689 number would soon be changing that number. As explained in Exhibit 1, Leon had previously switched phone numbers with his customers, as is common with individuals seeking to avoid law enforcement detection. Jane Doe 5 had also shown me a text message, sent from the 3689 number on approximately March 23, 2024, with the following message: "Greetings, I will change my number tomorrow for security and to take care of myself more I will send you a message with my name Leon tomorrow."

17.    In reviewing Mandi Ford's messages on the Device with the 3689 number, I noted that she had the phone stored as "LNewest," which I noted is consistent with other information that Alexis De Leon changes his number with customers. I also noted that on approximately March 23, 2024, the 3689 sent an identical message to Ford as it had sent to Jane Doe 5, regarding a plan to change the phone number. But the 3689 number had then remained active with Ford until April 2, 2024.

18.    On April 5, 2024, Jane Doe 5 received a message from (207) 735-9606 (the 9606 number) as follows: "Brother, how are you? I'm Leon. This is my new number, brother. I put the Maine number. It's me, Alex." At the direction of agents,

Jane Doe 5 messaged the 9606 number regarding an additional purchase of fentanyl. The 9606 number responded: "All right, let me know how for when if for Monday or so."

19. I noted that, in my experience in this investigation, this manner of communication is consistent with numerous previous messages sent from other accounts associated with the Leon DTO. Additionally, in my experience, it is common for out-of-state drug traffickers to obtain Maine area code 207 phone numbers, in an effort to draw less attention to their phone numbers by drug investigators.

20. I subsequently confirmed with T-Mobile that the 9606 number is indeed a number with T-Mobile service. I also obtained limited toll records for the 9606 number. The information received from T-Mobile was consistent with the number having been activated recently and, in addition, showed the phone has already been in communication with multiple phone numbers believed to be used by Bangor region customers of the Leon DTO, further confirming the information received on Jane Doe 5's phone.

## ADDITIONAL INFORMATION ABOUT WIRELESS CARRIERS

21. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built

into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

22. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the 9606 number, including by initiating a signal to determine the location of that phone on the T-Mobile network or with such other reference points as may be reasonably available.

23. Based on my training and experience, I know that T-Mobile can collect cell-site data about the 9606 number. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

24.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

25.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the 9606 number would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

26.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile.  I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively

and with a minimum of interference with T-Mobile services, including by initiating a signal to determine the location of 9606 number on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

27. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the 9606 number outside of daytime hours.

Respectfully submitted,

Nicholas Rich, Special Agent
U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Apr 11 2024

City and state: Bangor, ME

Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title